———o———

No. 7032.

## SUCCESSION OF PAUL A. BACAS.

### Syllabus.

Legacies in a prior testament are revoked by a posterior testament by which the testator donates to another all that he may leave after his death.

Appeal from the Civil District Court for the Parish of Orleans, No. 114,765, Division "C"; Honorable E. K. Skinner, Judge. Affirmed.

Esmond Phelps & F. F. Teissier, for plaintiff and appellant.

Emile Pomes, for defendant and appellee.

His Honor, CHARLES F. CLAIBORNE, rendered the opinion and decree of the Court, as follows:

This is a suit for the probate and execution of an alleged testament. The defense is that the document propounded is not a testament, but that, if it is, it has been revoked.

The deceased, Paul A. Bacas, left an olographic testament written in French of which the following is a translation:

352

"New Orleans, April 8th, 1911.

"This is my olographic testament dated and signed by my own hand.

"I give and bequeath to my children all that I may leave after my death.

"I give and bequeath to my wife, Louisa A. Bacas, the usufruct of my property and I name her my testamentary executrix with seizin and without bond.

(Signed)                          "P. A. BACAS."

This testament was probated and ordered executed.

About three months afterwards Mrs. E. Bird took the following rule:

"On motion of Mrs. Widow E. Bird, through Fernand F. Teissier, her attorney, and on suggesting to the Court that the late Paul A. Bacas died in this City, and that his estate was duly opened under the above entitled and numbered cause; on further suggesting that Mrs. Louisa Clay, widow of Paul A. Bacas, has been duly appointed and has qualified as the Testamentary Executrix of this estate;

"On further suggesting to the Court that the deceased had his life insured in the New England Mutual Insurance Company of Boston Mass., under policy No. 136,139 for one thousand dollars ($1000); on suggesting to the Court that said policy was duly assigned to Pierre Chevalier, Esquire, Major, and a resident of the Parish of Orleans, La.; on further suggesting that the said Pierre Chevalier has no legal interest in said policy;

"On further suggesting that, on November 2, 1900, the late Paul A. Bacas constituted and appointed mover by virtue of a will written, ·dated, and signed by him, as the sole beneficiary of said

353

policy; all as will more fully appear by reference to document annexed hereto and made part hereof, as mover's exhibit "A";

"On further suggesting to the Court that the said policy is now in the possession of said Pierre Chevalier, and that he should be ordered to deliver the same to Mrs. Louisa Clay, widow of Paul A. Bacas, as Executrix of this estate (who) should furnish the New England Mutual Insurance Company of Boston, Mass., proofs of the death of Paul A. Bacas and collect the proceeds of said policy, as an asset of this estate, and, ordered to pay mover One Thousand Dollars ($1000.00), the amount of said policy, in due course;

"It is ordered by the Court that Pierre Chevalier do show cause on Friday, March 24, 1916, at 11 o'clock A. M. why it should not be decreed that he has no interest in the said policy, and why he should not be ordered to deliver said policy to Mrs. Louisa Clay widow of Paul A. Bacas, as an asset of this estate;

"It is further ordered that Mrs. Louisa Clay, widow of Paul A. Bacas, do show cause on Friday, March 24, 1916, at 11 o'clock A. M., why the said will should not be probated, why she should not furnish the New England Mutual Insurance Company of Boston, Mass., proofs as to the death of the late Paul A. Bacas, and why she should not proceed to the collection of said Insurance Policy, as an asset of this estate and why she should not, in due course, turn the proceeds thereof to mover."

The Exhibit "A" is also in French of which the following is a translation:

"November 2, 1900.

"My dear Chevalier: In case of my death, I would request you to have the goodness to collect the

354

amount of insurance on my life No. 136,139 in the New England Mutual Ins. Co., and after having received same to have the goodness to remit it to Mrs. E. Bird, and oblige, your friend.

(Signed)                                        "P. A. BACAS."

Chevalier answered that he had no personal interest in the policy and filed it with his return for such disposition as the Court might make of it.

The Executrix filed a number of defenses which, on argument, were reduced to the two following:

> "That the document presented is not a will; and, in the alternative, if the Court considers said document to be a will in the olographic form, that same was revoked by the olographic will dated April 8th, 1911, filed and probated in this Court; * * * that said document does not make a legacy; but simply instructs Pierre Chevalier to collect the insurance and to have the kindness to remit the same to plaintiff in rule."

There was judgment in favor of the defendants in rule and against Mrs. Bird dismissing her rule.

Having arrived at the conclusion that the testament of April 8, 1911, has revoked all prior testamentary dispositions we are dispensed from the necessity of determining whether said Exhibit "A" is a testament or not; but we shall assume, for the purposes of this case, that it is a testament.

The law governing the revocation of testaments by posterior testaments is contained in the following articles of the Code:

> C. C. 1691 (1684): "The revocation of testaments by the act of the testator is express or tacit. * * * It is express when the testator has formally

declared in writing that he revokes his testament, or that he revokes such a legacy or a particular disposition. It is tacit when it results from some other disposition of the testator or from some act which supposes a change of will." * * *

C. C. 1693 (1686): "Posterior testaments, which do not, in an express manner, revoke the prior ones, annul, in the latter, only such of the dispositions there contained as are incompatible with the new ones, or contrary to them, or entirely different."

This article 1693 is almost a literal copy and translation of article 1036 of the Code Napoleon.

There is no law which fixes the meaning and effect upon a prior testament of a clause in a posterior testament by which a testator disposes of all the property he may leave at his death in favor of a designated legatee. It was left to the Courts to interpret the effect of such a clause.

The interpretation of Article 1693 arose in the case of *Sarce v. Dunoyer*, 11 *La.*, 220—in the year 1837. The deceased had left two testaments. By a prior one he made particular legacies of money and appointed a "universal legatee", by a posterior one, he made other particular legacies and named a different "universal legatee"; he also declared in his last testament "that he wished to persevere in said testament as being the expression of his last wishes." The contention was "that a universal legacy annulled all legacies contained in a preceding or prior will." In support of this proposition counsel quoted 9 *Duranton, No.* 447; 2 *Delvincourt, No.* 5, *p.* 385; 3 *Leclerc Droit Romain, pp.* 407-8. *Paillet Note* 5 *on Article* 1036 *C. N.*

The legatees under the prior testament relied on several decisions of the Royal Courts of France reported in Sirez. The Supreme Court said that there was no inconsistency

between particular legacies in a prior testament and a "universal legatee" in a posterior one, "when it is considered that the universal legatee is bound to discharge the particular legacies." The Court added: "The opinion of Duranton is the other way, but the reasoning of that learned professor, is not satisfactory to our minds."

The case of *Tournion v. Tournion*, 12 *La.*, 19, bears much resemblance to the case of Sarce above quoted. The deceased made two testaments. In the prior one, dated in 1831, he donated a tract of land to Fanny Richer and the balance of his property to his brothers and nephews; in the posterior one, dated in 1835, he named the plaintiff, his brother, Jean B. Tournion, his "universal legatee." The plaintiff alleged that the testament of 1831 was revoked by the one of 1835. He admitted that "he was charged by the testator to convey and deliver the legacy immediately after his death to Fannie Richer." The Court annulled the legacy in favor of the plaintiff on the ground that it contained a prohibited *fidei commissum* or trust but ordered the execution of both testaments. No reference, however, was made to the *Sarce case*.

Among the French commentators teaching that a universal legacy in a posterior testament does not revoke a particular legacy in a prior one are the following: 7 *Aubry & Rau*, p. 518, §725, note 24 quoting numerous decisions of courts; *Limoges* 13 *Mai* 1867, *Dev.* 67.2.314; 4 *Demante* p. 376; 3 *Troplong*, p. 582, §2078; 16 *Dalloz Rep. Leg.*, p. 1135, §4212; 1 *Grenier*, p. 783 §343; *Coin-Delisle*, p. 500, §5-6; 5 *Toullier*, p. 599, §646.

Those holding a contrary opinion are 2 *Baudry-Lac*, p. 44; 10 *Baudry-Lac*, p. 370, §2742; 4 *Boileaux*, p. 185; 22 *Demol*, §180, p. 159; 9 *Duranton* §447, p. 451, says: "A universal legacy absorbs and revokes every disposition con-

357

tained in anterior testaments." 14 *Laurent, p.* 234, §212; 2 *Delvincourt, p.* 385, §5.

But even among the French Courts and Commentators who are of the opinion that the mere naming of a universal legatee does not revoke prior legacies, several agree that the disposition by which the testator constitutes a certain person his sole heir or expressly bequeaths all of his property, movable and immovable, or all that he may leave at his death or all the disposable portion, revokes all prior legacies. *Coin-Delisle, p.* 500, §5.

> "Thus it has been decided that a testament which constituted a person legatee of all the movable and immovable left by the testator revoked the particular legacies comprising all the movable and immovable fortune of the testator made by a first testament. * * * Court of Caen March 26, 1830, and of Cassation, June 22, 1831." *Rogon on Art* 1036, p. 755; *Dalloz Codes Ann., p.* 755, §132, 133; 22 *Demol* §180, *bottom of page* 159; 7 *Aubry & Rau., p.* 518.

> "The revocation of particular anterior legacies should also be admitted if, in his last testament, the testator had expressed the wish that his universal legatee should become possessor of all his property without exception." *Dalloz Codes Ann., p.* 755, §125.

> "Likewise, particular legacies contained in a first testament which constitutes at the same time a universal legatee, are, independently of an express revocation, tacitly and virtually revoked by a posterior testament which leaves to a new universal legatee all that the testator will leave on the day of his death provided at least that this intention results from the terms themselves of the testament." *Dalloz Codes Ann., p.* 755, §127; *Paris* 12 *Fev.*

1877, *D. P.* 77, 2, 97; *Journal Palais* 1877 *p.* 613, *Texier v. Lagarde.*

"Decided nevertheless in a special case that particular legacies made in a first testament, and embracing the totality of the fortune of the testator, must be considered as revoked by a posterior testament, in which the testator, without expressly declaring his intention of revoking his preceding liberalities, constitutes a universal legatee to whom he bequeaths all his property movable and immovable." *Caen March* 26, 1830; *Cass, June* 22, 1831; 9 *Duranton, No.* 447; 4 *Toull, p.* 175; 14 *Laurent Nos.* 211, 212; 2 *Fuzier-Hermann, p.* 818, §27; 22 *Demol, p.* 159, §180; 7 *Aubry-Rau, p.* 518.

The controversy arose again in the Supreme Court of the State in the *Succession of Salvatore Pizzati, No.* 22,173 not yet reported.

Pizzati left six testaments. In the first five he instituted particular and universal legatees. In the last he says:

"I will and bequeath to my good friend, Robert Woodville of Utilla, S. H., whom I have known for over forty years, the disposable portion of my estate. Should he die before me I will and bequeath to his grandchild, Dorothy Helen Woodville, the disposable portion of my estate."

The particular legatees under the first five testaments claimed their legacies, contending that they had not been revoked by this last testament. The legatee under the last will resisted their demand on the ground that the last testament in his favor revoked all the five anterior testaments.

The Supreme Court had under consideration all the authorities which we have quoted above. Referring to the opinion in *Sarce v. Dunoyer*, 11 *La.*, 220, and after quoting

the reasons for judgment they say of it what the judges in that case had said of Duranton:

"This reasoning is not satisfactory." They then proceed to review the jurisprudence of this State and of France and the opinions of the French commentators. They quote particularly from Laurent who adopts the opinion of Duranton, and concerning him they say:

> "The matter being one purely of fact and common sense, Laurent and those who side with him would appear to have decidedly the best of the argument."

They then give their own reasons and interpretation as follows:

> "Now, as to a particular legacy not being inconsistent with, or contrary to, a universal legacy. To say that this is not is to say that the whole of a thing may be given to one person and at the same time a part of it to another—a patent absurdity.
>
> "True, the Civil Code, Article 1611, provides that the universal legatee is bound to discharge all the (special) legacies, but the framers of the Code did not mean by this to imply that the legacy of a part is not inconsistent with a legacy of the whole, for it manifestly is. But while such two legacies are thus inconsistent in fact, they need not necessarily be so in intention; and since it is the intention that govern, and since every testator manifestly intends that his will shall be carried out as he has made it, and since the nearest that this can come to be done when in the same will a part is given to one person and the whole to another, to assign the part to one and the remainder to the other, the law has made this special provision requiring this to be done. But the basis, the reason, of this is as just stated, namely: that when a testator sits down to make his last will and testament and makes it, he must be as-

360

sumed to have intended that the will should be carried out as he has made it, in all its parts, and the nearest that this can come to be done is to assign a part to one and the remainder to another. This interpretation is adopted, not because there is no inconsistency between the giving of a part to one person and the whole to another, for, manifestly, there is, but simply from dire necessity as being the best approximation that can be made in the matter. This, however, is true only where the two dispositions thus absolutely inconsistent are contained in one and the same will; it is manifestly not true when the two dispositions are contained in two wills of different dates. The two wills are then inconsistent and the later in date, it would seem, ought to prevail. * * * Whether the mere naming of a universal legatee in general terms and without a revoking clause, will, in any case, be considered to have tacitly revoked special legacies contained in a former testament, is a question upon which, as just stated, the courts and law writers of France differ. That question does not arise in the present case, for in the present case the testator has not in the will latest in date merely, in general terms, instituted a universal legatee, but has in plain language made a disposition entirely inconsistent with the legacies contained in the former wills. His language is: 'I give the disposable portion of my estate'. And in the will of October, 1911,—later in date than the will containing the special legacies—he has said: 'I give all the disposable portion of my estate, real, personal, and mixed.' If instead of resorting to legal refinements out of place in such a case, for ascertaining what was the intention of the testator we accept that intention as here plainly expressed we avoid all difficulties. Where a testator merely says I constitute such a one my universal legatee, there may be room for contending that he intended the person there named to take only

361

after the discharge of all the legacies, for that is how a universal legatee takes; but when he says I give all the property I may die possessed of to such a one, we do not see how there can be room for contending that he did not mean what he so plainly expressed. And we hold in the present he so intended."

The Court accordingly held that the sixth and last testament alone contained the last wishes of Pizzati and that it revoked in their entirety the five prior testaments.

The language of the testament under consideration contains much stronger language expressive of an intention to revoke all prior testaments then did the Pizzati testament. It comes directly under the last sentence of the opinion in the *Pizzati case* quoted above and the decision in *Texier v. Lagarde, J. P.* 1877, *p.* 613, also above quoted.

The Pizzati testament constituted only a legatee under a universal title. He donated "the disposable portion of his estate"; whatever that disposable portion might have been. C. C. 1612 (1604). It was not a universal legacy nor a legacy of all the property he might leave at his death. But in the present case Bacas begins with these words: "This is my olographic testament * * * I give and bequeath to my children all that I may leave after my death." It might well be said in the language of one of the French Commentators: "He excepts nothing who gives everything."

The judgment of the District Court is therefore affirmed.

Opinion and decree, April 30th, 1917.

Rehearing refused, May 28th, 1917.

Writ denied, July 3rd, 1917.